

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
AUSTIN
HANOI
HO CHI MINH CITY

*FIRM and AFFILIATE OFFICES*

STEVEN M. COWLEY
DIRECT DIAL: +1 857 488 4261
PERSONAL FAX: +1 857 401 3090
*E-MAIL:* SMCowley@duanemorris.com

*www.duanemorris.com*

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR

ALLIANCES IN MEXICO
AND SRI LANKA

October 13, 2021

VIA ECF

The Honorable Analisa Torres
United States District Judge
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

   **Re:**   ***Tom Hussey Photography, LLC v. BDG Media, Inc.,***
       **Index No. 1:21-CV-3514-AT**

Dear Judge Torres:

   This firm represents Plaintiff Tom Hussey Photography, LLC in the above-captioned action.  We write to bring the Court's attention to a recently issued opinion which we believe bears directly on the issues in the pending motion to dismiss in this action.  This opinion had not been issued at the time of the parties' briefing on the motion.

   The enclosed opinion, *Nicklen v. Sinclair Broadcast Grp.*, No. 20-CV-10300 (JSR), 2021 WL 3239510 (S.D.N.Y. July 30, 2021), bears on the issue of what it means to infringe copyright through display.  In this case, plaintiff, a photographer, brought an action against a news outlet and its affiliates, alleging infringement by embedding plaintiff's copyrighted video in an online article about the video without first obtaining a license.  Defendants filed a motion to dismiss, arguing, *inter alia*, that embedding the video in the article did not "display" it within the meaning of the Copyright Act.

   In rejecting defendants' arguments and finding that embedding a video on a website "displays" the video within the meaning of the Copyright Act, the court held:

DuaneMorris

The Honorable Analisa Torres
October 13, 2021
Page 2

[U]nder the plain meaning of the Copyright Act, a defendant violates an author's exclusive right to display an audiovisual work publicly when the defendant without authorization causes a copy of the work, or individual images of the work, to be seen -- whether directly or by means of any device or process known in 1976 or developed thereafter.

*Id*. at *3.

The Court further explained:

The concept of "display" thus includes "the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." H.R. Rep. No. 94-1476, at 64 (1976). The right is concerned not with how a work is shown, but <u>that</u> a work is shown.

*Id*. (emphasis original).

The Court added "[t]he Act defines to display as 'to show a copy of' a work, 17 U.S.C. § 101, not 'to make and then show a copy of the copyrighted work.'" *Id*. at *4.

This opinion – and its holding that display on a website is *per se* infringement regardless of how the display happened and without need to show a connected act of copying or distribution – goes to the issue raised in the motion to dismiss in this action – whether defendant infringed plaintiff's copyrights by displaying the works at issue on its website.  This issue is discussed in pages 7-12 of defendant's opening brief in support of its motion to dismiss (Dkt. No. 47), pages 9-15 of plaintiff's opposition (Dkt. No. 48), and in pages 4-10 of defendant's reply brief (Dkt. No. 51).

A copy of the opinion is enclosed.  We respectfully request that the Court take judicial notice of the *Nicklen* decision on the pending motion to dismiss.

Respectfully submitted,

/s/ Steven M. Cowley

Steven M. Cowley

SMC
Enclosure

DuaneMorris

The Honorable Analisa Torres
October 13, 2021
Page 3

cc:    All counsel of record (via ECF)

2021 WL 3239510
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Paul NICKLEN and Christina
Mittermeier, Plaintiffs,

v.

SINCLAIR BROADCAST
GROUP, INC., et al., Defendants.

20-CV-10300 (JSR)
|
Signed 07/30/2021

**Synopsis**
**Background:** Copyright owner brought action against news
outlet and its affiliates, alleging that they infringed on
owner's copyright by embedding owner's copyrighted video
of starving polar bear in online article about the video's
popularity without first obtaining license. Outlet and affiliates
filed motion to dismiss, arguing that embedding a video did
not "display" a video within meaning of Copyright Act and
including video in article was "fair use."

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

[1] outlet "displayed" owner's video within meaning of
Copyright Act when it embedded video in online article;

[2] purpose and character of use by outlet of copyrighted
video weighed in favor of finding "fair use";

[3] nature of video did not weigh strongly for or against
finding "fair use";

[4] amount of video used by outlet weighed against finding
"fair use"; and

[5] outlet's use of video, if widespread, would harm the
licensing market for video, and therefore factor of effect of
use on the market weighed against finding "fair use" of video.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (18)

**[1]** **Federal Civil Procedure** 🔑 Matters deemed
admitted; acceptance as true of allegations in
complaint

Threadbare recitals of the elements of a cause of
action and conclusory allegations in a complaint
are not presumed true on a motion to dismiss for
failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[2]** **Copyrights and Intellectual
Property** 🔑 Nature and Elements in General

To state a claim for copyright infringement,
a plaintiff must plead ownership of a valid
copyright and that the defendant has violated
at least one of the owner's exclusive statutory
rights in copyrighted works: reproduction,
public performance, public display, creation of
derivative works, and distribution. 17 U.S.C.A.
§ 106.

**[3]** **Copyrights and Intellectual
Property** 🔑 Motion Pictures and Other
Audiovisual Works

News outlet "displayed" copyright owner's video
of starving polar bear, within meaning of
Copyright Act provision affording owner the
exclusive right to display video publicly, when
it embedded video in online article about video's
popularity without obtaining license; embedded
hypertext markup language (HTML) code on
outlet's web page was information retrieval
system that permitted video to be seen and outlet
purportedly included code in web pages that
caused video to appear in articles no differently
than other content, even though video was stored
on social media server. 17 U.S.C.A. §§ 101,
106(5).

**[4]** **Copyrights and Intellectual
Property** 🔑 Motion Pictures and Other
Audiovisual Works

Nicklen v. Sinclair Broadcast Group, Inc., --- F.Supp.3d ---- (2021)
Case 1:21-cv-03514-AT   Document 60   Filed 10/13/21   Page 5 of 13

2021 WL 3239510

Under the Copyright Act, a defendant violates an author's exclusive right to display an audiovisual work publicly when the defendant without authorization causes a copy of the work, or individual images of the work, to be seen, whether directly or by means of any device or process known in 1976 or developed thereafter. 17 U.S.C.A. §§ 101, 106.

**[5]** **Copyrights and Intellectual Property** 🔑 Fair use

A defendant bears the burden of showing that a use of a copyrighted work is a "fair use." 17 U.S.C.A. § 107.

**[6]** **Copyrights and Intellectual Property** 🔑 Factors considered in general

In determining whether a defendant's use of a copyrighted work is a "fair use," courts weigh (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used, and (4) the effect of the use upon the market for or value of the work in light of the purposes of the Copyright Act. 17 U.S.C.A. § 107.

**[7]** **Copyrights and Intellectual Property** 🔑 Purpose and Character of Use

To evaluate the purpose and character of the use of a copyrighted work to determine whether the use is a "fair use," a court considers whether the use is commercial, whether the use is transformative, and whether there is evidence of bad faith. 17 U.S.C.A. § 107.

**[8]** **Copyrights and Intellectual Property** 🔑 Motion pictures and other audiovisual works

Purpose and character of use of copyrighted video by news outlet of starving polar bear weighed in favor of finding "fair use," although outlet operated for-profit news stations and websites that stood to profit from the web traffic the video attracted, where original purpose of the

video was likely to highlight the cruel effects of climate change on the polar bear population, and outlet did not use video to illustrate independent story about polar bears or environmentalism, but reported news about the video itself and its popularity. 17 U.S.C.A. § 107.

**[9]** **Copyrights and Intellectual Property** 🔑 Commercial or noncommercial use

The crux of the distinction between commercial and noncommercial use of a copyrighted work to evaluate the purpose and character of the use and determine whether such use is a "fair use" is whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. 17 U.S.C.A. § 107.

**[10]** **Copyrights and Intellectual Property** 🔑 Commercial or noncommercial use

A challenged use of a copyrighted work, as used to evaluate the purpose and character of the use and determine whether such use is a "fair use," is not presumptively unfair because it is profit driven. 17 U.S.C.A. § 107.

**[11]** **Copyrights and Intellectual Property** 🔑 Transformative use

A "transformative use" of a copyrighted work, to evaluate the purpose and character of the use and determine whether such use is a "fair use," alters the purpose and context of the copyrighted work with new expression, meaning, or message. 17 U.S.C.A. § 107.

**[12]** **Copyrights and Intellectual Property** 🔑 Motion pictures and other audiovisual works

Nature of copyrighted video of starving polar bear did not weigh strongly for or against finding "fair use" of the video by news outlet in online article about video's popularity without first obtaining license from copyright owner; owner's

videography reflected his artistic choices and the video purported to depict reality and was made publicly available, but it was arguable whether video was created for news-gathering or non-artistic purposes or whether it was intended to express a point of view. 17 U.S.C.A. § 107.

**[13]** **Copyrights and Intellectual Property** 🔑 Motion pictures and other audiovisual works

Amount of copyrighted video of starving polar bear used by news outlet in online article about video's popularity weighed against finding "fair use," where outlet embedded entire video when it could have used a single image or other means of conveying the video's popularity. 17 U.S.C.A. § 107.

**[14]** **Copyrights and Intellectual Property** 🔑 Effect of use on market for or value of protected work

When a defendant offers a market substitute for the original copyrighted work, its use is not "fair use." 17 U.S.C.A. § 107.

**[15]** **Copyrights and Intellectual Property** 🔑 Amount and Substantiality of Portion Used

In determining whether use of a copyright is a "fair use," the more copying that is done to achieve a purpose that differs from the purpose of the original copyrighted work, the less likely it is that the copy will serve as a satisfactory substitute for the original. 17 U.S.C.A. § 107.

**[16]** **Copyrights and Intellectual Property** 🔑 Effect of use on market for or value of protected work

When analyzing the effect of the infringing use on the market for a copyrighted work to determine whether the use of the work is a "fair use," courts ask whether, if the challenged use becomes widespread, it will adversely affect the potential market for the work. 17 U.S.C.A. § 107.

**[17]** **Copyrights and Intellectual Property** 🔑 Motion pictures and other audiovisual works

News outlet's use of copyright owner's video of starving polar bear in online article about video's popularity without first obtaining license, if widespread, would harm the licensing market for video, and therefore factor of effect of use on the market weighed against finding outlet's "fair use" of video; widespread adoption of outlet's use could overtake market for video and owner had licensed video to almost two dozen entities in the United States and around the world. 17 U.S.C.A. § 107.

**[18]** **Copyrights and Intellectual Property** 🔑 Defenses and permitted uses

Where the fair use inquiry does not turn on visual differences, but rather on whether the copyrighted work is factual or artistic, whether the challenged use is classified as transformative news reporting, or whether the use affected the licensing market for the work, the copies of the work attached to the complaint do not contain enough factual content to enable a solid assessment on a motion to dismiss. 17 U.S.C.A. § 107.

**Attorneys and Law Firms**

Robert N. Kaplan, Kaplan Fox & Kilsheimer LLP, New York, NY, Bryan Daniel Hoben, Peekskill, NY, James Henry Bartolomei, James H. Bartolomei, III PA, Little Rock, AR, for Plaintiffs.

Thomas Byrne Sullivan, Ballard Spahr LLP, New York, NY, for Defendants Sinclair Broadcast Group, Inc., WCWN Licensee, LLC, WCWN, LLC., KDSM, LLC, KDSM Licensee, LLC, Chesapeake Media I, LLC, KRNV, LLC, KRXI, LLC, KVCW, LLC, KVMY, LLC, KATV, LLC, KATV Licensee, LLC, KTUL, LLC, KTUL Licensee, LLC, WLUK Licensee LLC, WJAR Licensee LLC, WCWF Licensee, LLC, WBMA Licensee, LLC, WSET Licensee,

LLC, WVTV Licensee, Inc., Raleigh (WRDC-TV) Licensee, LLC, Birmingham (WABM-TV) Licensee, Inc., WICS Licensee, LLC, KOKH LLC, KOKH Licensee, LLC, Milwaukee Television LLC, WCGV Licensee, LLC, Sinclair Media III, Inc., WCHS Licensee, LLC, WVAH Licensee, LLC, Sinclair Properties, LLC, WDKA Licensee, LLC, WMMP Licensee, LLC, Sinclair Television of El Paso, LLC, KDBC Licensee, LLC, WGME, Inc., WGME Licensee, LLC, WSMH, Inc., WSMH Licensee, LLC, WUCW Licensee, LLC, KABB Licensee, LLC, KDNL Licensee, LLC, KEYE Licensee, LLC, KFDM Licensee, LLC, KFOX Licensee, LLC, KGAN Licensee, LLC, KHGI Licensee, LLC, KHQA Licensee, LLC, KOCB Licensee, LLC, KPTH Licensee, LLC, KRCG Licensee, LLC, KSAS Licensee, LLC, KTVL Licensee, LLC, KTVO Licensee, LLC, KUTV Licensee, LLC, KVII Licensee, LLC, WACH Licensee, LLC, WEAR Licensee, LLC, WFGX Licensee, LLC, WFXL Licensee, LLC, WGFL Licensee, LLC, WGXA Licensee, LLC, WKRC Licensee, LLC, WLFL Licensee, LLC, WLOS Licensee, LLC, WMSN Licensee, LLC, WNAB Licensee, LLC, WNWO Licensee, LLC, WOAI Licensee, LLC, Wolf Licensee, LLC, WPBN Licensee, LLC, WPDE Licensee, LLC, WPEC Licensee, LLC, WPGH Licensee, LLC, WRGB Licensee, LLC, WRLH Licensee, LLC, WSYX Licensee, LLC, WTGS Licensee, LLC, WTOV Licensee, LLC, WTTO Licensee, LLC, WTVC Licensee, LLC, WVTX Licensee, LLC, WTVZ Licensee, LLC, WUHF Licensee, LLC, WUTV Licensee, LLC, WUXP Licensee, LLC, WWHO Licensee, LLC, WWMT Licensee, LLC, WXLV Licensee, LLC, WZTV Licensee, LLC, Sinclair Television of Abilene, LLC, Sinclair Television of Bristol, LLC, Sinclair Television of Montana, LLC, WCTI Licensee, LLC, Sinclair Television of Fresno LLC, KMPH Licensee, LLC, WJAC Licensee, LLC, Sinclair Television of Omaha, LLC, KPTM Licensee, LLC, Sinclair Television of Bakersfield, LLC, Sinclair Television of Portland, LLC, Sinclair Kennewick Licensee, LLC, Sinclair Seattle Licensee, LLC, Sinclair Boise Licensee, LLC, Sinclair Yakima Licensee, LLC, Sinclair Lewiston Licensee, LLC, Sinclair Eugene Licensee, LLC, KAME, LLC, WICD Licensee, LLC, KFXA Licensee LLC, KUPN Licensee LLC, KUQI Licensee, LLC, WSTQ Licensee, LLC, WUPN Licensee, LLC, Sinclair Television of California, LLC, Sinclair Television of Seattle, Inc., Sinclair Television of Oregon, LLC, Sinclair Television of Washington Inc., Sinclair La Grande Licensee, LLC.

Joseph Slaughter, Ballard Spahr LLP, New York, NY, for Defendants.

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

**\*1** Plaintiff Paul Nicklen captured footage of a starving polar and posted the video to his Instagram and Facebook accounts. Dozens of news outlets and online publishers, including Sinclair Broadcast Group, Inc. and its affiliates (collectively, the "Sinclair Defendants"), embedded the video in online articles without first obtaining a license. Nicklen then sued the Sinclair Defendants for copyright infringement. The Sinclair Defendants now move to dismiss the Second Amended Complaint, arguing that embedding a video does not "display" the video within the meaning of the Copyright Act and that the video's inclusion in an article about the video's popularity was fair use. For the reasons that follow, the Court denies the motion to dismiss.

FACTUAL AND PROCEDURAL BACKGROUND

I. Factual Allegations
The following allegations are presumed true for purposes of the motion to dismiss. Paul Nicklen is a Canadian nature photographer, filmmaker, and founder of the nonprofit conservationist organization SeaLegacy. Second Am. Compl. ("SAC"), ECF No. 72, at ¶¶ 2, 9. Nicklen is the author and registered copyright owner of a video of an emaciated polar bear wandering the Canadian Arctic ("the Video"). See SAC ¶¶ 159, 169; see also SAC, Exs. 4, 4A. On December 5, 2017, Nicklen posted the Video to his Instagram and Facebook accounts. SAC ¶ 5; see also SAC, Ex. 7. In a caption, Nicklen urged his social media followers to consider the "haunt[ing]" and "soul-crushing scene" and to take steps to mitigate the harms of climate change. SAC, Ex. 7. Nicklen added that "[w]e must reduce our carbon footprint, eat the right food, stop cutting down our forests, and begin putting the Earth -- our home -- first." Id. He then invited his followers to "join us at @sea_legacy as we search for and implement solutions for the oceans and the animals that rely on them -- including us humans." Id. Finally, the caption noted that the Video "is exclusively managed by Caters News" and directed those seeking "[t]o license or use [the Video] in a commercial player" to contact Caters News. Id.; see also SAC ¶ 5.

Sinclair Broadcast Group, Inc. is a Maryland-based media conglomerate that owns "over 200" local television stations

and 118 wholly owned subsidiaries nationwide ("Sinclair Affiliates"). SAC ¶¶ 11-12; SAC, Ex. 2.; see also Def. Mot., ECF No. 78, at 1. On or around December 11, 2017, Sinclair Broadcast Group published an article titled "Starving polar bear goes viral in heartbreaking video." SAC, Ex. 5. Sinclair Broadcast Group included the Video in this article using the Instagram or Facebook application programing interface ("API") embed tool. Id. at ¶ 158. Sinclair Broadcast Group "embedded" the Video by including in its website an HTML code provided by Instagram or Facebook that directed web browsers to retrieve the Video from the Instagram or Facebook server for viewing on Sinclair's website. See SAC ¶¶ 158-60. The Video appeared within the body of the Sinclair article even when a reader took no action to retrieve the Video or to navigate to Nicklen's Facebook or Instagram account, and even when a reader did not have a Facebook or Instagram account. Id. at ¶¶ 160-61.

**\*2** The Sinclair Broadcast Group article opens by stating that "[a] photograph of a polar bear is grabbing attention as it shows the animal slowly succumbing to starvation." SAC, Ex. 6. The article goes on to repeat quotes Nicklen gave to National Geographic and to explain that Nicklen "advocated for the reduction of the carbon footprint," quoting the portion of Nicklen's Instagram caption that described the polar bear population's battle against extinction. Id. The article closes by noting that "[t]he video has already reached over 1 million views on Facebook." Id. Nicklen alleges upon information and belief that this Sinclair Broadcast Group article was reposted -- and the Video was re-embedded -- on all television station websites operated by the Sinclair Defendants. SAC ¶ 170.

Though Nicklen provided licensing information in the text of his Instagram post, the Sinclair Defendants did not obtain a license or Nicklen's consent before embedding the Video. SAC ¶¶ 162, 285. On or about December 8, 2020, Nicklen sent the Sinclair Affiliates a takedown notice, but the Video remains displayed on television station websites owned by Sinclair Broadcast Group, Inc. and Sinclair Affiliates. SAC ¶¶ 170, 178.

II. Procedural Background

Nicklen and Christina Mittermeier [1] sued the Sinclair Defendants, among others, for copyright infringement. ECF No. 7. Nicklen filed a First Amended Complaint adding class allegations. See ECF No. 11. Nicklen then filed a Second

Amended Complaint, identifying each Sinclair affiliate and the URL of each infringing article. See ECF No. 72.

[1]  Co-plaintiff Christina Mittermeier, a photographer who took a still photograph of the same polar bear that was also widely embedded on online news sites, does not allege that the Sinclair Defendants embedded her photo. See SAC ¶¶ 277-78. As such, the Court does not discuss factual allegations and claims relevant only to Mittermeier.

In the operative complaint, Nicklen alleges that by embedding Nicklen's copyrighted video on Sinclair websites using the Instagram or Facebook API, the Sinclair Defendants infringed his exclusive reproduction, distribution, and display rights in violation of 17 U.S.C. §§ 106(1), (3), and (5). See SAC ¶¶ 284-85. Nicklen alleges in the alternative that Sinclair Broadcast Group is liable for inducing the copyright infringement of its affiliates. Id. at ¶¶ 291-95. The Sinclair Defendants move to dismiss the Second Amended Complaint. ECF No. 85.

**LEGAL STANDARD**

**[1]** On a motion to dismiss pursuant to Rule 12(b)(6), the Court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiffs' favor." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 61 (2d Cir. 2010) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)). "Threadbare recitals of the elements of a cause of action" and conclusory allegations are not presumed true. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Disregarding legal conclusions couched as fact, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). A claim for relief is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

**DISCUSSION**

I. Copyright Infringement

[2]  To state a claim for copyright infringement, a plaintiff must plead ownership of a valid copyright and that the defendant has violated at least one of the owner's exclusive rights under 17 U.S.C. § 106: reproduction, public performance, public display, creation of derivative works, and distribution. See, e.g., Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010).

*3  [3]  Nicklen has pleaded ownership of a valid copyright. See SAC ¶¶ 159, 169; see also SAC, Ex. 4A. Nicklen also asserts that by embedding the Video, the Sinclair Defendants violated his exclusive right to display the Video publicly. See SAC ¶ 284. The fundamental question at issue here is whether embedding a video "displays" the video within the meaning of the Copyright Act of 1976. This Court concludes that it does.

[4]  Under the Copyright Act, "[t]o 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially." 17 U.S.C. § 101. A device or process is defined as "one now known or later developed," id., and to show means "to cause or permit to be seen." See Show, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/show (last visited July 27, 2021); accord Show, v., Oxford English Dictionary, https://www.oed.com/view/Entry/178737 (defining to "show" as "[t]o present or display (an object) in order that it may be looked at; to expose or exhibit to view"). Thus, under the plain meaning of the Copyright Act, a defendant violates an author's exclusive right to display an audiovisual work publicly when the defendant without authorization causes a copy of the work, or individual images of the work, to be seen -- whether directly or by means of any device or process known in 1976 or developed thereafter.

In 1976, Congress crafted a broad display right, conscious that section 106(5) "represent[ed] the first explicit statutory recognition in American copyright law of an exclusive right to show a copyrighted work, or an image of it, to the public." H.R. Rep. No. 94-1476, at 63 (1976). The display right as initially drafted was "analogous to the traditional common-law right of first publication in a literary work, or to the moral right of divulgation in continental law, but that right would cease as soon as a copy of the work was transferred." R. Anthony Reese, The Public Display Right: The Copyright Act's Neglected Solution to the Controversy Over RAM "Copies", 2001 U. of Ill. L. Rev. 83, 95 (2001). But this approach was ultimately set aside. The display right in its final form encompasses "not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public." H.R. Rep. 94-1476, at 63. As such, an infringer displays a work by showing "a copy" of the work -- not the first copy, or the only copy, but any copy of the work. See 17 U.S.C. § 101.

Further, the exclusive display right set forth in the Copyright Act is technology-neutral, covering displays made directly or by means of any device or process "now known or later developed." The concept of "display" thus includes "the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." H.R. Rep. No. 94-1476, at 64 (1976). The right is concerned not with how a work is shown, but that a work is shown.

The Copyright Act's text and history establish that embedding a video on a website "displays" that video, because to embed a video is to show the video or individual images of the video nonsequentially by means of a device or process. Nicklen alleges that the Sinclair Defendants included in their web pages an HTML code that caused the Video to "appear[ ]" within the web page "no differently than other content within the Post," although "the actual Video ... was stored on Instagram's server." SAC ¶¶ 160-61. The embed code on the Sinclair Defendants' webpages is simply an information "retrieval system" that permits the Video or an individual image of the Video to be seen. The Sinclair Defendants' act of embedding therefore falls squarely within the display right.

*4  The Sinclair Defendants nevertheless insist that embedding is not display and ask the Court to adopt the Ninth Circuit's "server rule." Under that rule, a website publisher displays an image by "using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory." Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1160 (9th Cir. 2007). In contrast, when a website publisher embeds an image, HTML code "gives the address of the image to the user's browser" and the browser "interacts with the [third-party] computer that stores the infringing image." Id. Because the image remains on a third-party's server and is not fixed in the memory of the infringer's computer, therefore, under the "server rule," embedding is not display. Id.

The server rule is contrary to the text and legislative history of the Copyright Act. The Act defines to display as "to show a copy of" a work, 17 U.S.C. § 101, not "to make and then show a copy of the copyrighted work." The Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, makes the display right merely a subset of the reproduction right. See Jane C. Ginsburg & Luke Ali Budiardjo, Embedding Content or Interring Copyright: Does the Internet Need the "Server Rule"?, 32 Colum. J. L. & Arts 417, 430 (2019) (explaining that the server rule "convert[s] the display right into an atrophied appendage of the reproduction right" and thereby "ignores Congress's endeavor to ensure that the full 'bundle' of exclusive rights will address evolving modes of exploitation of works"). Further, the server rule distinguishes between showing a copy possessed by the infringer and showing a copy possessed by someone else. See Perfect 10, 508 F.3d at 1161 (concluding that "Google does not ... display a copy of full-size infringing photographic images for purposes of the Copyright Act" because "Google does not have a copy of the images for purposes of the Copyright Act"). As discussed above, when a copy of a work is shown, the Copyright Act makes no such distinction. See, e.g., Am. Broad. Companies, Inc. v. Aereo, Inc., 573 U.S. 431, 441-48, 134 S.Ct. 2498, 189 L.Ed.2d 476 (2014) (holding that, despite technological complexity concerning the "behind-the-scenes" delivery of images, the defendant violated the exclusive right to "show [an audiovisual work's] images in any sequence," because "whether Aereo transmits from the same or separate copies, it ... shows the same images and makes audible the same sound"). Rather, to "show a copy" is to display it. 17 U.S.C. § 101.

Further, the Ninth Circuit's reasoning in Perfect 10 should be cabined by two facts specific to that case: (1) the defendant operated a search engine and (2) the copyrighted images were displayed only if a user clicked on a link. See Goldman v. Breitbart News Network, LLC, 302 F. Supp. 3d 585, 595 (S.D.N.Y. 2018) (distinguishing Perfect 10 on these grounds). When a user "open[s] up a favorite blog or website to find a full color image awaiting the user, whether he or she asked for it, looked for it, clicked on it, or not," the Ninth Circuit's approach is inapt. See id. This case does not involve a search engine, and Nicklen alleges that no user intervention was required to display the Video's individual images nonsequentially. An individual still image from the Video awaits Sinclair readers whether they click the image to

play the video or not. Thus, Perfect 10's test is a poor fit for this case, and the Court declines to adopt it.

Proponents of the server rule suggest that a contrary rule would impose far-reaching and ruinous liability, supposedly grinding the internet to a halt. These speculations seem farfetched, but are, in any case, just speculations. Moreover, the alternative provided by the server rule is no more palatable. Under the server rule, a photographer who promotes his work on Instagram or a filmmaker who posts her short film on YouTube surrenders control over how, when, and by whom their work is subsequently shown -- reducing the display right, effectively, to the limited right of first publication that the Copyright Act of 1976 rejects. The Sinclair Defendants argue that an author wishing to maintain control over how a work is shown could abstain from sharing the work on social media, pointing out that if Nicklen removed his work from Instagram, the Video would disappear from the Sinclair Defendants' websites as well. But it cannot be that the Copyright Act grants authors an exclusive right to display their work publicly only if that public is not online.

*5 For the foregoing reasons, Nicklen has plausibly alleged that by embedding the Video without authorization, the Sinclair Defendants violated the display right.

## II. Fair Use

[5]  [6]  "Fair use" of a copyrighted work is not copyright infringement, 17 U.S.C. § 107, but the defendant bears the burden of showing that a use is fair. Authors Guild v. Google, Inc., 804 F.3d 202, 213 (2d Cir. 2015). In determining whether a defendant's use is a fair one, courts weigh (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used, and (4) the effect of the use upon the market for or value of the work in light of the purposes of the Copyright Act. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

### A. The Purpose and Character of the Use

[7]  To evaluate the purpose and character of the use, the Court considers whether the use is commercial, whether the use is transformative, and whether there is evidence of bad faith. Id.

[8]  [9]  [10]  On the one hand, the use here is commercial. The "crux" of the distinction between commercial and noncommercial use is whether "the user stands to profit

from exploitation of the copyrighted material without paying the customary price." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). The more commercial the use, the more likely the first factor weighs against fair use. However, a challenged use is not "presumptively unfair" because it is profit driven. Campbell, 510 U.S. at 594, 114 S.Ct. 1164. For instance, "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," yet news reporting is specifically enumerated under § 107 as an example of a fair use of a copyrighted work. Consumers Union of United States, Inc. v. Gen. Signal Corp., 724 F.2d 1044, 1049 (2d Cir. 1983); see also Harper & Row, 471 U.S. at 561, 105 S.Ct. 2218.

The Sinclair Defendants operate for-profit news stations and websites that stood to profit from the web traffic the polar bear video attracted. News outlets often license photos and videos to illustrate and add visual interest to their articles -- but here, the Sinclair Defendants have not paid the licensing fee. The use is therefore commercial.

[11] On the other hand, the use here may well be transformative. A transformative use alters the purpose and context of the copyrighted work with "new expression, meaning, or message. See Google LLC v. Oracle Am., Inc., ⸺ U.S. ⸺, 141 S. Ct. 1183, 209 L.Ed.2d 311 (2021) (quoting Campbell, 510 U.S. at 579, 114 S.Ct. 1164). "In the context of news reporting ... the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 84 (2d Cir. 2014). For example, "a news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about," thereby "transforming the function of the work in the new context." Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017).

The original purpose and meaning of the work was likely to highlight the cruel effects of climate change on the polar bear population and to inspire the audience to donate to or work with SeaLegacy, a conservation group founded by Nicklen. See SAC ¶ 2. The Sinclair Defendants' use focused on the Video's popularity. The article stresses that the Video went "viral" and that the accompanying photograph was "grabbing attention," relies on National Geographic reporting to describe the circumstances under which the Video was

made, and then adds that the "video has already reached over 1 million views." SAC, Ex. 8. The Sinclair Defendants did not use the Video to illustrate an independent story about polar bears or environmentalism; instead, the Sinclair Defendants "report[ed] news about the Images themselves." See Barcroft, 297 F. Supp. 3d at 352 (emphasis in original); BWP Media USA, Inc. v. Gossip Cop Media, Inc., 196 F. Supp. 3d 395, 406 n.6 (S.D.N.Y. 2016) (distinguishing fair use cases in which "the fact of the photograph" is the story from unfair uses in which the contents of the photograph are used as illustration). Because "the use of a copyrighted photograph in a news article can properly be deemed transformative where the photograph itself is the subject of the story," the first factor weighs in favor of fair use. See McGucken v. Newsweek LLC, 464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020), reconsideration denied, 2020 WL 6135733 (S.D.N.Y. Oct. 19, 2020).

*6 Finally, there is no indication of bad faith. Though the Sinclair Defendants did not request a license despite the availability of licensing information in Nicklen's Instagram post, the Second Circuit is "aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith." Blanch v. Koons, 467 F.3d 244, 256 (2d Cir. 2006).

### B. The Nature of the Copyrighted Work

[12] The nature of the copyrighted work is "rarely found to be determinative," and this case is no exception. On Davis v. The Gap, Inc., 246 F.3d 152, 175 (2d Cir.2001). Copyright law recognizes that creative or expressive works are closer to the "core" of intended copyright protection, while factual or previously published works are entitled to thinner copyright protection. Campbell, 510 U.S. at 586, 114 S.Ct. 1164; Blanch at 256. Nicklen's videography reflects his artistic choices of camera angle, exposure settings, and video length, among other things. Simultaneously, the work purports to depict reality and was made publicly available before the challenged use. It is arguable whether the Video was created for "news-gathering or non-artistic purposes" or whether it was intended to express a point of view. See N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015). This factor does not weigh strongly for or against fair use.

### C. The Amount and Substantiality of the Portion Used

By analyzing "the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was 'reasonable in relation to the

purpose of the copying.' " Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 926 (2d Cir. 1994).

 **[13]** This factor weighs against a finding of fair use because the Sinclair Defendants embedded the entire Video on their websites. Though the Sinclair Defendants respond that it was necessary to show the entire video to fulfill their news purpose, the Sinclair Defendants could have conveyed the Video's virality by providing a screenshot of the number of likes or views the Video received. In the alternative, a single image of the emaciated bear rather than an embedded copy of the full work could have conveyed that the Video was shocking or heart-wrenching enough to grab the Internet's attention. Because the Sinclair Defendants reproduced the heart of the work, this factor weighs against fair use.

### D. The Effect of the Use on the Market

 **[14]** **[15]** **[16]** When a defendant "offer[s] a market substitute for the original," its use is not fair. NXIVM Corp. v. Ross Inst., 364 F.3d 471, 481 (2d Cir. 2004). "[T]he more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." Authors Guild, 804 F.3d at 223. When analyzing the effect of the infringing use on the market for a copyrighted work, courts ask "whether, if the challenged use becomes widespread, it will adversely affect the potential market for" the work. Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 613 (2d Cir. 2006). The market for licensing photographs and videos to media outlets is a "traditional, reasonable" market of the sort courts consider in this analysis. See, e.g., Ferdman v. CBS Interactive Inc., 342 F. Supp. 3d 515, 541 (S.D.N.Y. 2018).

 **[17]** A news article about a viral video is unlikely to threaten to "deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." See Authors Guild, 804 F.3d at 223; see also Walsh v. Townsquare Media, Inc., 464 F. Supp. 3d 570, 586 (S.D.N.Y. 2020) (finding no harm to the licensing market where a photograph appeared as part of a post alongside text and other images). Because a news article recontextualizes a work and serves a different purpose, it is unlikely that someone who wanted to purchase the work would find reviewing the news article an adequate substitute.

 *7 However, the Sinclair Defendants' use of the copyrighted video, if widespread, would harm the licensing market for Nicklen's video. There would be no need for news outlets to

license the video at all if each outlet could, without Nicklen's prior authorization, embed the video from Instagram or Facebook. Unlike a parodic use, widespread adoption of the Sinclair Defendants' use could overtake the market for Nicklen's video. Accepting as true Nicklen's allegations that he licensed the Video to "almost two dozen entities both in the United States and throughout the world," SAC ¶ 152, this factor weighs against fair use.

### E. Conclusion

The Sinclair Defendants' fair use affirmative defense cannot be resolved at this stage. The fair use inquiry is a "fact-driven," "context-sensitive" consideration of the nature and purpose of the challenged use, the nature of the copyrighted work, the amount used, and the potential harm to the market for the copyrighted work. Cariou v. Prince, 714 F.3d 694, 704-05 (2d Cir. 2013). Thus, granting a motion to dismiss on fair use grounds is rare. See id.; Graham v. Prince, 265 F. Supp. 3d 366, 377 (S.D.N.Y. 2017) (pointing out that courts "generally do not address the fair use defense until the summary judgment stage" and even then are wary of granting summary judgment); BWP Media USA, Inc. v. Gossip Cop Media, LLC, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015) (observing the "dearth of cases granting such a motion"); Hirsch v. CBS Broadcasting, Inc., 2017 WL 3393845, at *6 (S.D.N.Y. Aug. 4, 2017) (noting that resolving fair use on a motion to dismiss is "uncommon"). To be sure, the pleadings alone could establish fair use in an appropriate case. See TCA Television Corp. v. McCollum, 839 F.3d 168, 178 (2d Cir. 2016) ("[T]his court has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim."); Cariou, 714 F.3d at 707. But this is not the rare case in which the Court can make a fair use determination simply by comparing the two works, such that "discovery would not provide additional relevant information." See Arrow Productions, Ltd. v. Weinstein Co., 44 F. Supp. 3d 359, 368 (S.D.N.Y. 2014).

 **[18]** Where "the fair use inquiry does not turn on visual differences," but rather on whether the work is factual or artistic, whether the challenged use is classified as transformative "news reporting," or whether the use affected the licensing market for the work, the copies of the work attached to the Complaint "do not contain enough factual content to enable a solid assessment." Hirsch, 2017 WL 3393845, at *7. Such is the case here. Because the Court's fair use analysis would benefit from a better-developed factual record, the Court denies the motion to dismiss.

met their difficult burden of proving a fair use defense on the sheer basis of the pleadings.

### CONCLUSION

The Court hereby denies the motion to dismiss, because Nicklen has stated a prima facie case for copyright infringement and because the Sinclair Defendants have not

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2021 WL 3239510

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.